**STATE, Plaintiff-Appellee, v. HEALY, Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 21636. Decided July 24, 1950.

Frank T. Cullitan, County Pros., Frederick W. Frey, Asst. County Pros., Cleveland, for plaintiff-appellee.

M. A. Picciano, Allan Melzer, Cleveland, for defendant-appellant.

## OPINION

By McNAMEE, J:

At the September, 1948, term of court the defendant, Leslie T. Healy, was indicted by the Grand Jury of Cuyahoga County and charged in twelve counts with violation of §12447-1 GC. When the cause came on for trial on June 6, 1949, five of the counts of the indictment were nolled. Thereafter, on a trial before a jury the defendant was convicted on each of the remaining seven counts. Judgment was rendered upon the verdict of the jury and concurrent sentences to the Ohio State Penitentiary imposed upon defendant by the trial court.

With the exception of the dates and names of the alleged victims and in one instance the amount involved, the seven counts in the indictment contain identical allegations. The first count illustrates the pattern of all seven. Omitting the formal allegations, it reads:

"* * * Do Find and Present, That Leslie T. Healy on or about the 31st day of January, 1947, at the county aforesaid, did unlawfully obtain possession of certain money in the amount and value of One Thousand ($1000.00) Dollars from Lionel A. Silverman and Edith Silverman, husband and wife, the property of Lionel A. Silverman and Edith Silverman, husband and wife, and did obtain said property from the said Lionel A. Silverman and Edith Silverman, husband and wife, with the consent of the said Lionel A. Silverman and Edith Silverman, husband and wife, which consent the said Leslie T. Healy induced by false and fraudulent representations and pretenses with the intent of permanently depriving said Lionel A. Silverman and Edith Silverman, husband and wife, of said One Thousand Dollars ($1000.00)."

An amended Bill of Particulars furnished by the prosecuting attorney, supplemented the indictment and contained the following general allegations relating to all of the counts of the indictment:

"* * * Prosecuting Attorney says that the said Leslie T. Healy during the period beginning with June 21, 1946 and ending with January 13, 1947, inclusive, carried on and carried out a scheme and artifice to trick and to defraud each and all of the persons named in the various counts of the indictment. The defendant, Leslie T. Healy, represented that he was a real estate broker and builder and the owner of an allotment known as the Bexley Park Subdivision located in the City of South Euclid, County of Cuyahoga and State of Ohio, and did agree to build homes for the various persons on certain lots in said allotment which he failed to perform, and the defendant Leslie T. Healy, did obtain possession of the monies of the various persons listed in the various counts of the indictment by inducing their consent by a false and fraudulent representation and pretense, in the amount and at the approximate time as set out in the various counts of the indictment."

Relating specifically to count No. 1, are the following allegations in the Bill of Particulars:

"In the First Count of the indictment, the State expects to prove that the said Leslie T. Healy on the 31st day of January, 1947, in the county aforesaid, did unlawfully obtain possession of certain money in the amount and value of $1000.00 from Lionel A. Silverman and Edith S. Silverman, husband and wife, the property of said Lionel A. Silverman and Edith Silverman, with the consent of the said Lionel A. Silverman and Edith Silverman, induced by a false representation in this, to-wit: That on the said date of January 31, 1947, the said Leslie T. Healy was the owner of certain property to-wit, sublot No. 478, located on Wandsworth Road in the City of South Euclid, County of Cuyahoga and State of Ohio, and that the said lot was free and clear of all taxes, assessments and encumbrances, and that he would build a house on said lot. Construction of said house to be further financed by mortgage loan. The said Lionel A. Silverman and Edith S. Silverman, relying on said false pretenses, the said Leslie T. Healy unlawfully obtained from the said Lionel A. Silverman and Edith S. Silverman the sum of $1000.00 with intent thereby unlawfully to defraud, whereas, in truth and in fact the said Leslie T. Healy was not the owner of said sublot No. 478, and the said lot was not free and clear of all taxes, assessments and encumbrances, and no house was built on said lot, and the said Leslie T. Healy at the time

he so falsely pretended as aforesaid, well knew said false pretenses to be false and with the intent to permanently deprive the said Lionel A. Silverman and Edith S. Silverman of said $1000.00."

Similar specific allegations relating to each separate count of the indictment are set forth in the Bill of Particulars.

The following facts appear in the record: For many years prior to July, 1946, defendant was engaged in the building and real estate business. He commenced active operations as a builder about 1929 and between that time and 1947 constructed several hundred homes. In 1944 he exercised an earlier acquired option and with the financial aid of one Anthony Mutillo purchased most of the lots in the Bexley Park Subdivision located in South Euclid, Ohio. Defendant executed a blanket mortgage to Mutillo who agreed to release the lots from the operation of the mortgage upon the payment of a stipulated portion of Healy's indebtedness to him. Between 1944 and July 1946, defendant constructed about 75 homes in the Bexley Park Subdivision and in each instance upon Healy's promise to pay the stipulated amount, Mutillo complied with his agreement and executed the necessary releases. The transactions referred to in the indictment were entered into at various times between July 15, 1946 and March 1, 1947. Each transaction was evidenced by a written contract with the prospective purchaser by the terms of which defendant agreed to build a home according to plans and specifications and upon a designated lot in the Bexley Park Subdivision selected by the purchaser. At the times these contracts were executed, the defendant received a deposit of $1000.00 to apply on the purchase price. In some cases the entire balance of the purchase price and in others a substantial portion thereof, was to be raised by a construction loan. Each contract provided that "all taxes and assessments to be pro-rated the date of filing deed for record in the name of purchaser."

None of the homes that were the subject matter of the contracts with the prospective purchasers were constructed and in each of the cases referred to in the indictment the purchasers cancelled the contracts and demanded the return of the money deposited with the defendant.

Healy claims that at all times he acted with honesty of purpose and that the failure of performance of the contracts was due to defaults by the purchasers; to the rising cost of labor and materials that seriously impaired his financial ability, and to other circumstances beyond his control.

It appears that in respect of the transaction described in count No. 1, a construction loan in the specified amount was approved by the South Euclid Savings & Loan Company, but the purchasers, Lionel A. Silverman and Edith S. Silverman, refused to sign the note and mortgage, cancelled the contract and sought the return of the money deposited with the defendant.

Gabriel Burgio, the purchaser named in the second count in the indictment, was unable to obtain a construction loan in the required amount. Because of this, the purchaser cancelled the contract and demanded a return of his deposit.

The transaction described in count No. 5 was conditioned upon the sale of a home then owned and occupied by the purchaser, Oliver Farroni. It was agreed that defendant would act as a broker in an effort to sell Ferroni's home, the proceeds of the sale to be used in connection with the contract with defendant for the construction of a new home. Defendant was unable to sell Ferroni's home at the price named, which resulted in the cancellation of the contract and upon demand by the purchaser the defendant repaid him $250.00 of the $1000.00 deposited.

Count No. 3 refers to a contract with J. Trevor Guy which was executed in July, 1946, and provided for the construction of a home on sublot 344 within one year for the sum of $8800.00. In addition to the deposit of $1000.00 with defendant, Guy obtained a construction loan for the balance of $7800.00. He executed a note and mortgage for this amount and deposited an additional sum of $131.00 to cover expenses. Eleven months passed without any work being done on the construction of the home, at which time the contract was cancelled by the purchaser. Defendant did not have title to sublot 344 nor did he have any interest in or any enforcible contract to acquire the ownership of this parcel. It does appear, however, that a few months before July, 1946, and with a view to the ultimate purchase of the lot, defendant had oral conversations with members of the family of one Knud Jensen who was the owner thereof. After the cancellation of the contract the defendant repaid $200.00 to the purchaser.

Count No. 4 involved a transaction with George Selden, then a resident of Cincinnati, Ohio. Defendant agreed to build a six room brick bungalow on sublot 288 for the sum of $15,175.00. The contract provided that in addition to the original deposit of $1000.00 a construction loan of $10,000.00 was to be obtained and the balance of $4175.00 placed in escrow by the purchaser. The South Euclid Savings & Loan Company approved a construction loan in the sum of $9500.00, and although the purchaser failed to deposit the entire balance

due under the contract, he did place the additional sum of $3203.76 in escrow but it developed that re-spread assessments approximating $1000.00 were found to be a lien against this property and after some correspondence between the loan company and Selden and Healy and Seldon, in regard to this item, the contract was cancelled by the purchaser who withdrew the funds he had deposited in escrow and demanded the return of the $1000.00 payment made to the defendant.

Counts 6 and 7 involved a contract between defendant and Anthony Vadnal, by the terms of which defendant agreed to build a home for Vadnal on sublot 321 for the price of $9000.00. Vadnal deposited $1000.00 with defendant and as an inducement to the prompt prosecution of the work by defendant, Vadnal later advanced an additional $3000.00. Defendant commenced, but did not finish the excavation of the sublot and arranged for the installation of sewer connections but failed to do any further work on the construction of the house. At the time he received the additional deposit of $3000.00, defendant conveyed sublot 321 to Vadnal. Within a short time thereafter this sublot was foreclosed for non-payment of delinquent taxes. Vadnal cancelled his contract with defendant and after employing an attorney was able to secure the return of $800.00.

That defendant suffered serious financial reverses in the spring and summer of 1947 cannot be doubted. Several homes then under construction by him pursuant to contracts with persons not referred to in the indictment were taken over and completed by the South Euclid Savings & Loan Company. The record is replete with evidence of the unsuccessful efforts of prosecuting witnesses during the spring and summer of 1947 to see and talk to defendant with a view of securing performance of the contracts by him or a restitution of funds deposited by them. There is evidence also of several meetings of the creditors of defendant which were held in an effort to devise a plan that would enable defendant to raise sufficient funds to pay his creditors.

In his charge to the jury, the trial judge omitted any reference to a particular or specific wrongful intent on the part of the accused as being an element of the offenses charged in the indictment. The subject of intent generally was covered in the charge of the court as follows:

"The crime of larceny by trick charged in the indictment in this case involves intent. To constitute a criminal offense in this case two things must be established; the intent to do the wrong or commit the crime, and the performance of

the act or the commission of the wrong in pursuance of the intent. The intent and the act must concur in point of time."

In his instructions to the jury defining the elements of the crimes charged the trial judge said:

"I will now summarize as to what you must find and be convinced of beyond a reasonable doubt in order to find defendant guilty on any count of the indictment. You must find that:

"1. Leslie T. Healy obtained possession of property of value of another.

"2. That he obtained it with the consent of the person from whom obtained.

"3. That he obtained it by means of a false or fradulent representation, pretense, token or writing.

"4. That the false or fraudulent representations, pretense, token or writing was or were the inducements which led the person from whom the property was taken, to deliver or surrender the possession to Healy.

"5. That the transactions took place in Cuyahoga County."

In another portion of the charge the trial judge elaborated the instructions in respect of the elements of the crime charged but did not include either an intent to steal or an intent to defraud as essential ingredients thereof.

In this appeal defendant assigns eleven separate grounds of error, but in none of them does he directly challenge the correctness of the general charge of the court, nor does any assignment of error directly raise the question whether defendant was denied a fair trial by reason of the trial court's failure to require the state to prove a larcenous intent on the part of the defendant.

However, in his motion for a new trial, filed in common pleas court, defendant claims that the trial court erred in its charge to the jury and the overruling of the motion for a new trial is assigned as error here.

Upon a consideration of the whole record, the majority of this court is of the opinion that the basic and vital issue to be determined in this appeal is whether under the terms of §12447-1 GC, an intent to steal is an essential element of the crime of larceny by trick.

Sec. 12447-1 GC reads:

"Larceny by Trick: Penalty: Whoever obtains possession of, or title to, anything of value with the consent of the person from whom he obtains it, provided he induced such con-

sent by a false or fraudulent representation, pretense, token, or writing, is guilty of larceny by trick, and, if the value of the thing obtained by such false or fraudulent representation, pretense, token, or writing is thirty-five dollars or more, shall be imprisoned in the penitentiary not less than one year, nor more than seven years, or if the value is less than that sum, be fined not more than two hundred dollars or imprisoned not more than thirty days, or both."

The statute is of comparatively recent enactment, having become effective Sept. 16, 1943. It was construed and applied by the trial court as not including a specific wrongful intent as an element of the offense therein defined. The indictment contains allegations respecting the defendant's intent to deprive the owners permanently of their property. Similar allegations appear in the Bill of Particulars which also contains averments of "an intent to defraud." Yet, under the instructions of the trial court, the State was not required to prove a specific wrongful intent on the part of defendant as an element of the crimes charged.

If an act is made an offense by statute without reference to the intent with which it was committed, the intent of the person accused is immaterial, but where the statute defining a crime includes a specific intent as an "ingredient of its criminality" such intent must be averred and proven. 12 O. Jur. 61-62 Sec. 18.

There can be no doubt as to the power of the General Assembly to make an act or conduct criminal without regard to the intent of the actor. Whether it has done so is to be determined from the intention of the legislature as expressed in the language of the statute. Generally, intent is an essential element if the crime involves moral turpitude, but not if it is malum prohibitum. 22 C. J. S. Sec. 30 page 85.

The statute makes no express reference to "intent" as an element of the offense therein defined. The trial court adopted a literal construction of the language of the statute as hereinabove quoted and as it appears in the privately published annotated Codes of Ohio Laws. This construction supports the conclusion that the legislature intended to omit 'intent' as an element of the offense. But such construction produces results so incongruous and unjust as to compel its rejection.

To illustrate:—Under a literal construction of §12447-1 GC, one who obtains possession of the personal property of another by fraudulent representations, may be convicted of larceny by trick even though he acted without the intent permanently

to deprive the owner of his property. Under §12447 GC, one who obtains the possession of the property of another by trespass, cannot be convicted of larceny in the absence of proof of such wrongful intent, yet the penalty for conviction under either statute is the same.

As literally construed, §12447-1 GC, would permit the conviction of a person who obtains title to property of another by false pretenses, irrespective of the intent of the accused. However, §13104 GC which defines the offense of obtaining property by false pretense, expressly includes an 'intent to defraud' as an element of the crime. The penalty upon conviction of a felony under §13104 GC is one to three years imprisonment in the penitentiary, while the penalty under §12447-1 GC for a conviction involving property valued at $35.00 or more, is imprisonment in the penitentiary from one to seven years. Thus a conviction under §13104 GC, which requires proof of an 'intent to defraud' carries with it a lesser maximum penalty than a conviction of the similar offense of larceny by trick under §12447-1 GC, where under a literal construction of the statute proof of such intent is not required.

A literal construction of a statute that produces these incongruities and unjust comparative results, cannot be accepted as a true expression of the legislative will.

The legislative purpose in enacting §12447-1 GC, is disclosed upon an examination of the Title of the Act and the enacting clause of §12447-1 GC, as set forth in volume 120, page 444 of the Official Laws of Ohio. The title reads:

"AN ACT

To supplement §12447 GC by the enactment of a supplemental section relative to larceny by trick."

Section 1 of the Act, as adopted by the legislature reads:

"Sec. 1. That §12447 GC be supplemented by the enactment of Supplemental §12447-1 GC to read as follows: * * *."

Then follow the operative provisions of the Act hereinabove first quoted.

A supplemental Act is defined in the leading case of McCleary v. Babcock, 169 Ind. 228, 82 N. E. 453, 455 (1907) as follows:

"It signifies something additional, something added to supply what is wanting. Webster's Int. Dict. It is that which supplies a deficiency, adds to or completes, or extends that

which is already in existence without changing or modifying the original. State ex rel etc. v. Board (1898) 16 O. C. C. 218-221; Rahway Savings Inst. v. Rahway (1890) 53 N. J. L. 48, 20 Atl. 756."

State ex rel v. Board (1898) 16 O. C. C. 218-221, cited with approval in the McCleary case, was decided by the Third Circuit Court of Ohio at the January, 1897, term, and affirmed by the Supreme Court of this State without opinion on Nov. 30, 1897, 38 W. L. B. 280.

In defining a supplemental Act the Circuit Court said:

"What relation does a supplement sustain to the principal section? Webster gives the following definitions of a supplement:

'That which supplies a deficiency; that which fills up, completes or makes an addition to something already organized, arranged or set apart; a part added to, or a continuation of * * *.' 'It is used sometimes as a synonym of appendix.'

"When we bear these definitions in mind and take up the language of the supplement in question, we find that its very life and operation depend on the provisions and operation of the section to which it is added."

See also: 50 Amer. Jr. 16. Sutherland on Statutory Construction.

Vol. 1 p. 393, Sec. 1928; First State Bank v. Bottineau State Bank, 56 Mont. 363; 185 P. 162, 8 A. L. R. 631; Lost Creek School Township v. York, 215 Ind. 636; 21 N. E. (2d) 58; 127 A. L. R. 1287.

In view of the foregoing authoritative definitions, the terms of §12447-1 GC must be construed together with §12447 GC defining the crime of larceny. The last mentioned section does not in express terms make reference to 'intent.' It provides in simple language that "whoever steals anything of value is guilty of larceny." In §12447 GC the word 'larceny' and the word 'steal' are synonymous and are used in the common law signification of those terms. 'Larceny' is defined in 25 O. Jur. page 6, as follows:

"Larceny under §12447 GC, is the same as at common law. It may be defined as the wrongful or felonious taking and carrying away of the personal property of another of some intrinsic or substantial value without the owner's consent, and **with the intent permanently to deprive him thereof.**" (Emphasis ours.)

Further citation of authority in support of the proposition that larceny under the statute includes the specific intent "to deprive the owner of his property" is unnecessary. Some courts refer to this element of the crime merely as a "felonious intent." Others define it as the "intent to convert the property to the use of the taker or to the use of some person other than the owner." But however phrased, it is universally held that one of the essential elements of common law larceny, whether adopted by statute or not, is the intent to deprive the owner of his property. This specific wrongful intent being an essential element of the crime of larceny is necessarily included within the terms of supplemental §12447-1 GC. To paraphrase the language of the Circuit Court in State ex rel etc v. Board, supra, the very life and operation of §12447-1 GC depends upon the provisions of the section to which it is added.

In speaking of the historical development of the law applied to the crime of larceny, Mr. Justice Holmes said:

"We think it desirable to prevent one man's property being misappropriated by another, and so we make larceny a crime. The evil is the same whether the misappropriation is made by a man into whose hands the owner has put the property, or by one who wrongfully takes it away. But primitive law in its weakness did not get much beyond an effort to prevent violence and very naturally made a wrongful taking, a trespass, part of its definition of the crime. In modern times, the judges enlarged the definition a little by holding that, if the wrong-doer gets possession by a trick or device, the crime is committed."

"Path of the Law" (1897) 10 Harv. Law Rev. 457-469.

In Ohio, as elsewhere, the courts enlarged the definition of common law larceny to include thefts accomplished by fraudulent means as well as by trespass. Prosecutions for larceny by trick under §12447 GC were upheld by the courts of this state for many years prior to the passage of §12447-1 GC. **Miller v. State, 20 Abs 408; Eisenman v. State, 12 Abs 145;** West Ohio Digest, Vol. 16 "Larceny" Sec. 14 (1) compare **Kellogg v. State, 26 Oh St 15.**

The legislature is presumed to have knowledge of the judicial construction of legislative acts. It may be assumed therefore that at the time of the adoption of §12447-1 GC, the General Assembly knew that §12447 GC had theretofore been judicially construed as including the crime of common law larceny by trick. For this reason it may be inferred that insofar as they relate to the element of possession only, the

terms of supplemental §12447-1 **GC**, add little, if anything, to the principal larceny statute. The significant addition to §12447 **GC**, that appears in supplementary §12447-1 **GC**, is the incorporation therein of the provisions that make the fraudulent obtaining of **title** to the property of another a new element of the crime of larceny by trick. Prior to the adoption of §12447-1 **GC**, larceny, whether accomplished by fraud or by trespass, related only to the possession and not to the **title** of the property of another. In **Kellogg v. State, 26 Oh St 15**, the Supreme Court said:

"To constitute larceny, in a case where the owner voluntarily parts with the possession of his property, two other conditions are essential:

"1. The owner at the time of parting with the possession, must expect and intend that the thing delivered will be returned to him or disposed of under his direction for his benefit;

"2. The person taking the possession must, at the time, intend to deprive the owner of his property in the thing delivered. But where the owner intends to transfer, not the possession merely, but also the title to the property, although induced thereto by the fraud and fraudulent pretenses of the taker, the taking and carrying away do not constitute a larceny. In such case the title vests in the fraudulent taker and he cannot be convicted of the crime of larceny, for the simple reason that, at the time of the transaction, he did not take and carry away the goods of another person, but the goods of himself."

It was the apparent legislative design by the adoption of §12447-1 **GC**, to prevent those who were prosecuted for larceny by trick from successfully defending against the charge on the ground that title, as well as possession, of the property of another had been obtained by false pretense or fraudulent representations. That the statute has this effect cannot be doubted. What effect it has, if any, upon that part of §13104 **GC**, which defines the crime of "Obtaining property by false pretense" we need not determine. That question is not before us in this appeal.

Sec. 12447-1 **GC** is patterned after one of the subdivisions of Sec. 1290 of the penal laws of New York which became effective in 1942. The New York statute re-defines the crime of larceny in a manner that abolishes the legal distinction theretofore existing between the crimes of common law larceny, common law larceny by trick, obtaining property by

false pretense, and embezzlement. Sec. 1290 of the penal laws of New York reads:

"A person who, with intent to deprive or defraud another of the use and benefit of property, or to appropriate the same to the use of the taker, or of any other person other than the true owner, wrongfully takes, obtains or withholds, by any means whatever, from the possession of the true owner or of any other person any money, personal property, thing in action, evidence of debt or contract, or article of value of any kind, steals such property and is guilty of larceny."

"Hereafter it shall be immaterial in, and no defense to a prosecution for larceny that 1. The accused obtained **possession of, or title** to such property **with the consent of the person from whom he obtained it, provided he induced such consent by a false or fraudulent representation, pretense, token or writing;"** (Emphasis ours.)

Subsequent paragraphs of the New York Act eliminate other defenses formerly available in prosecutions for common law larceny but are not material here.

The new Ohio Act defining "Larceny by trick" is less comprehensive in scope than the New York statute but there is a marked similarity in the language of §12447-1 GC and paragraph 1 of Sec. 1290 of the New York law. The sense and meaning of these two provisions is the same. It was the apparent intention of the General Assembly of Ohio in enacting §12447-1 GC and borrowing the language of paragraph 1 of the New York law to render unavailable in any prosecution for larceny by trick the defense that title as well as possession was obtained by the wrongdoer.

Sec. 1290 of the New York Act provides in express terms that a specific wrongful intent is an element of larceny in its various forms as therein defined. In Ohio a similar result was achieved by designating §12447-1 GC as an Act supplementary to the larceny statute which has always included the "intent to deprive the owner of his property" as an element of the offense.

We hold therefore that "an intent to deprive the owner of his property" is an essential element of the crime of larceny by trick as defined in §12447-1 GC, and that the trial court committed error prejudicial to the rights of the defendant in failing to so instruct the jury.

It is suggested that the failure of the trial court to instruct the jury that the specific "intent to deprive the owner of his

property" was an essential element of the offense was compensated by the charge of the court on the subject of intent generally wherein the jury was told that "an intent to do the wrong or commit the crime" must be established. This suggestion is untenable. In the absence from the charge of a complete and accurate definition of the crime, there exists no basis for the claim that proof of "an intent to commit the crime" is the equivalent of proof of the specific wrongful intent which is a material element of the offense. The instruction relating "to the intent to commit the crime" referred to the crime as defined in the charge of the court. This definition was deficient and incomplete. It failed to include one of the essential elements, that by clear implication is embraced within the statutory definition of the offense. The definition of the crime as contained in the charge of the court is based upon a literal construction of the operative terms of the statute. By the instructions relating to proof of "an intent to commit the crime" the jury was told in effect that proof of the acts described in the language of the statute, without more, was sufficient to warrant a conviction. This instruction was misleading and cannot be considered as a substitute for the omitted instructions relative to the specific wrongful intent which is an element of the crime of larceny by trick.

The defendant was accused of swindling and the particular intent with which he acted was the crucial issue in the case. However, under the instructions of the court this vital issue was removed from the consideration of the jury. The failure to so charge the jury cannot be considered as a mere omission.

In **Miller v. State, 125 Oh St 415,** the Supreme Court held that in a criminal case the omission from the charge of an essential element of the crime is "error prejudicial to the accused and available on error under a general exception."

Defendant's second assignment of error embraces the claims that the trial court erred:

(a) in overruling defendant's motion to quash based upon the vagueness and indefiniteness of §12447-1 GC.

(b) in overruling defendant's motion for a new trial;

(c) in overruling defendant's motion in arrest of judgment.

In support of this assignment, defendant claims inter alia that the words "false representation" as used in §12447-1 GC, refer to representations of past or existing facts and that alleged false promises cannot be made the basis of a prosecution under the statute.

In **Harris v. State, 125 Oh St 257,** in defining the words "false pretense" as used in §13104 GC, the Supreme Court said:

"There may have been a breach of confidence or trust in the accused's failure to carry out his promise to pay the fine and costs in the future; but this particular crime cannot be based upon the failure to keep that promise; it must be based upon the false representation of an existing fact coupled with a promise. 'A promise is not a pretense.' 2 Bishop's Criminal Law, (9th Ed) Sec. 419."

However, in **State v. Singleton, 85 Oh Ap 248** (March 30, 1949) it was held:

"Under the provisions of §12447-1 GC, any representation, pretense, token or writing, made by the actor in furtherance of a scheme or artifice to defraud, is a fraudulent representation, pretense, token or writing, and may be both false and fraudulent; and a fraudulent representation, pretense, token or writing may relate to future facts, events and transactions, as well as to existing facts and past events and may be promissory in character."

The Singleton case was decided by this Court, acting through visiting judges assigned to service in this District. The Supreme Court refused to review the case on its merits.

In view of these circumstances, we are not persuaded that a re-examination of the question whether false promises are included within the terms of §12447-1 GC, is warranted. Accepting the rule of the Singleton case as the law, we are, nevertheless, of the opinion that there can be no successful prosecution under §12447-1 GC, based upon alleged false promises, unless it be averred in the indictment or bill of particulars and established by proof beyond a reasonable doubt that the accused had no intention of performing the promises at the time they were made.

In a separate assignment of error defendant claims that the trial court erred in overruling his motion to quash the indictment based upon its alleged uncertainty and indefiniteness and that it did not apprise the defendant of the nature and cause of the charges against him. It is defendant's contention that the bill of particulars contained no averments negativing the truth of the alleged false representations relative to his ownership of the various sublots and the absence of tax liens against the property.

We find, however, that in respect of the allegations relating to defendant's ownership of the property and his alleged representations of its freedom from taxes, that the bill of particulars

does contain averments that conform to the rule laid down in **Harris v. State, 125 Oh St 257,** that "the indictment must negative by special averment the truth of the pretense alleged."

Defendant makes no claim of a defect in the indictment or bill of particulars because of the absence of averments therein which negative the truth and good faith of defendant's promises to build homes. He is therefore precluded by the terms of §13437-28 GC from asserting such defect as a ground of error in this appeal. However, as hereinbefore indicated, a prosecution under §12447-1 GC, based upon alleged false promises must rest upon averments that negative the intention of the accused to perform his promissory representations.

Defendant's claim of error based upon the alleged misconduct of the prosecutor in demanding the checks, vouchers and other business records of defendant, is overruled. The trial court's instructions to the jury were effective to obviate any prejudice to the defendant by reason of this incident at the trial.

We are of the opinion that it was error to exclude from the consideration of the jury the ledger sheets of defendant's commercial account, and the evidence offered by him in respect of his completion of homes in 1946 at a financial loss to himself. Such evidence was competent as bearing upon defendant's intent and upon the allegations contained in the bill of particulars that the defendant

"during the period beginning with June 21, 1946 and ending with January 13, 1947, inclusive, carried on and carried out a scheme and artifice to trick and to defraud each and all of the persons named in the various counts of the indictment."

We cannot and do not consider or determine whether the verdict and judgment are against the weight of the evidence for the reason that defendant's conviction rests upon a construction of the statute that omitted a specific wrongful intent as an essential element of the crimes charged.

We have considered all other assignments of error and except as hereinabove noted, find them to be without merit.

For the reasons hereinabove stated, the judgment of the common pleas court is reversed and the cause is remanded for further proceedings according to law. Exceptions. Order See Journal.

HURD, J, concurs
SKEEL, PJ, dissents.
(See dissenting Opinion by SKEEL, PJ.)

## DISSENTING OPINION

By SKEEL, PJ:

The defendant was indicted, tried and found guilty on seven counts charging larceny by trick, as defined by §12447-1 GC. From such judgment of guilty, the defendant brings this appeal on questions of law to this Court claiming the following errors:

"1. The court erred in overruling defendant's motion to quash the indictment.

"2. (a) The court erred in overruling defendant's motion to quash, based upon the vagueness, indefiniteness and uncertainty of §12447-1 GC.

"(B) The court erred in overruling defendant's motion for a new trial.

"(c) The court erred in overruling defendant's motion in arrest of judgment.

"3 (a) Misconduct of the prosecuting attorney in the presence of the jury.

"(b) The court erred in overruling motion of defendant for leave to withdraw a juror, based upon said misconduct.

"4 (a) The court erred in the admission of testimony offered by the state over objection, thereby denying defendant's constitutional rights guaranteed him under **Art. I, Sec. 10 Ohio Constitution.**

(b) Prejudicial remarks of the court in the presence of the jury.

5. The court erred in excluding testimony offered by the defendant.

6. (a) The verdict is manifestly against the weight of the evidence and is contrary to law.

(b) The court erred in overruling defendant's motion for a directed verdict at the close of the state's case and renewed at the close of all the testimony."

The defendant was engaged in the building and real estate business and prior to 1947 had built more than 150 dwelling houses in the Noble Road-Mayfield Road section of Greater Cleveland. During the conduct of this business he had taken title to some two or three hundred lots in a subdivision known as Bexley Park, which was located on the east side of Warrensville Center Road, south of Mayfield Road and opposite the Oakwood Golf Club course. This transaction took place some time in 1944. In taking title to these lots, he, as a part of the financing of such purchase, gave a blankket mortgage

to one Anthony Mutillo for a consideration of $3000.00. This mortgage is noted on the certificate of title on the lots involved in this case as being a debt obligation of $7500.00. At the time of the purchase of said subdivision by defendant there was then several years of delinquent taxes due on each of the lots.

The defendant's building operations seemed to have progressed without difficulty until the latter part of 1946 and the early part of 1947, when, according to the undisputed evidence, a number of houses then under construction were taken over and finished under the supervision of the loan company that had granted a construction loan for the building of such houses and the defendant by his own testimony acknowledged that he was in financial difficulties.

The first count charged that the defendant unlawfully obtained possession of $1000.00 from Lionel A. and Edith Silverman by false and fraudulent representations and pretenses with intent to permanently deprive the said Lionel and Edith Silverman of said money.

The Silvermans in response to an advertisement of defendant offering to build residence property, called at defendant's place of business on Noble Road. The defendant displayed plans and gave other information concerning his building operations on lots which he owned in Bexley Park. The Silvermans after a second visit entered into a contract for the purchase of a house to be built on sublot 478 located on Wandsworth Road in Bexley Park, for the sum of $10,300.00. The Silvermans testified that defendant promised that he would start the building within two weeks and that it would be completed within three to six months. At the time this contract was signed, the defendant demanded and received $1000.00 from the Silvermans. The Silvermans wanted to make such down payment in escrow but defendant demanded that it be paid to him. There was, at the time this contract was entered into, $536.66 delinquent taxes against the lot. The defendant represented that he was the owner of the Bexley Park Subdivision.

Defendant never started the work of building the house. At some time shortly after the contract was entered into, he made an application for a construction loan at The South Euclid Savings & Loan Company. This loan was finally approved by the savings & loan company but the Silvermans refused to sign it because of the failure of defendant to proceed. He had, on several occasions prior to the approval of the loan, met the Silvermans and when asked why he had not started the work, his excuse had to do with shortage of

labor and materials. It was never suggested to the Silvermans by the defendant that if a construction loan was to be had, no work in furtherance of the contract to build could precede the filing of the construction mortgage for record.

The Silvermans finally demanded the return of their money which defendant agreed to do and after having defaulted on several promises, he told them they would have to extend him more time as he was "financially embarrassed." The Silvermans did not get any of the down payment back. No work of any kind was ever done toward the construction of the house and the lot has since been sold at sheriff's sale for nonpayment of taxes.

The second count of the indictment involves the sale of sublot 480 to Gabriel Burgio, following very closely the same pattern as was used in the Silverman transaction. This contract was entered into on Mar. 31, 1947. Burgio testified that defendant, prior to inducing him to make a down payment of $1000.00, represented that the house would be finished in September, 1947; that the lot was free from taxes (at the time this representation was claimed to have been made, there was about $500.00 delinquent taxes due thereon), and that he would take care of the necessary financing at the bank. (The defendant's evidence is to the effect that he agreed to pay up the delinquent taxes.) Nothing was said that would even suggest that the financing must of necessity precede the starting of the work of building the house. Considerable effort was expended by defendant in trying to get a mortgage loan. When all efforts to finance the building had failed and the work did not proceed as defendant had promised, this witness refused to pay the additional part of the down payment of $2000.00 and demanded his money back. Defendant was then without funds and he met this witness's demand for a return of the $1000.00 by a statement that he was in "financial difficulties" and thereupon gave him a promissory note, no part of which has ever been paid.

The third count of the indictment was concerned with the sale of sublot 344, together with a promise to build a house thereon for Mr. J. Trevor Guy. The contract was dated July 15, 1946. This sublot was not owned by defendant, nor did he have control over the right to sell it, or make any effort to secure such right after representing to Guy that he was the owner. With this additional fact, the transaction conformed to the same pattern as described in the other counts of the indictment, with the additional fact that Mr. Guy received a return of $200.00 of his $1000.00 deposit. The application for the construction loan of $7775.00 which de-

fendant was to arrange for, was not made by him until April 17, 1947. It was later approved by The South Euclid Savings & Loan Company.

The fourth count of the indictment concerned the sale of sublot 288 with the agreement that defendant would build a house thereon for Mr. Selden of Cincinnati. This contract was entered into on March 1, 1947. The purchaser paid $1000.00 down and made application at The South Euclid Savings & Loan Company for the necessary financing. The savings & loan company before approving the loan of $9500.00, instead of $10,000.00 requested, leaving a deficit of $500.00, notified Selden that there was $911.20 delinquent and unpaid taxes which had to be paid in full before complete approval could be had. The defendant agreed that it was his obligation to pay these taxes. He failed to pay any part thereof. Mr. Selden, upon signing the application for the necessary construction loan, deposited over $3000.00 with the bank, in addition to the $1000.00 deposited with defendant. The defendant's failure to meet any of the requirements to proceed with the contract or pay the back and delinquent taxes caused Selden thereafter to demand the return of the $1000.00 deposit. The defendant had used the money for other purposes and was unable to return it. A total of $200.00 was returned however at a later date. There was never any work done upon the construction of the house.

The fifth count of the indictment has to do with the purchase of sublot 479 in connection with the building of a house thereon by defendant for which the purchasers, Oliver J. and Mary J. Ferroni, were to pay $11,500.00. $7200.00 of the purchase price was to be financed and the balance to be paid in cash. This purchaser owned a house which defendant represented he could sell, by which sale the funds necessary to carry out the transaction were to be derived. The purchaser paid $1000.00 to defendant upon the signing of the contract on January 13, 1947. It later developed that the purchaser's house could not be sold as readily as was anticipated by the parties. The defendant represented that the new house would be ready by May, 1947. When defendant failed to do anything in carrying out the promises made to Ferroni, the latter demanded his money back and was successful in getting back $250.00. With these exceptions the evidence discloses about the same facts as were developed in the other counts in the indictment.

Counts No. 6 and 7 charge defendant with having unlawfully taken a total of $4000.00, ($1000.00 as to count No. 6 and $3000.00 as to count No. 7) from Anthony S. Vadnal in

a transaction involving the sale of sublot 320 and a contract to build a house thereon. The contract price was $9000.00.

The representations inducing the down payment of $1000.00 of this sale followed closely the pattern found in the other counts in the indictment. These representations included the statement that he was the owner of the allotment; that the property was tax free and that the building of the house would proceed at an early date.

Count No. 7 had to do with inducing Vadnal to part with an additional $3000.00 on the representation that if this money was paid the building would proceed with greater rapidity. Upon the payment of said additional sum, defendant deeded the lot to Vadnal and his wife. About four months thereafter, the Vadnal's were served with notice as defendants of an action in foreclosure seeking to sell sublot 320 to satisfy the delinquent taxes. Mr. Vadnal then tried to get his money back and succeeded to the extent of $800.00. At one point in this transaction, a sewer connection was made and excavation begun, but the bulldozer broke down and nothing further took place toward building the house. What was done, however, occurred before the necessary financing was completed and mortgage deed placed of record.

The defendant's first claim of error cannot be sustained. The allegations of each count of the indictment set forth all of the essential elements of the crime as defined by §12447-1 GC, and by the bill of particulars the defendant was informed of the claims of the state with sufficient particularity to enable him to prepare his defense.

The defendant's second assignment of error is divided into three parts. (1) Overruling defendant's motion to quash because of the claimed indefiniteness of §12447-1 GC, defining larceny by trick; (2) in overruling defendant's motion for new trial; and (3) in overruling defendant's motion in arrest of judgment.

Sec. 12447-1 GC in part provides:

"Whoever obtains possession of or title to anything of value with the consent of the person from whom he obtained it, provided he induced such consent by false or fraudulent representations, pretense, token or writing is guilty of larceny by trick * * *."

This section was passed to supplement the crime of larceny as defined by §12447 GC. The strictness with which the courts have held to elements of the common law crime of larceny has made necessary the passing of statutes defining

embezzlement, obtaining property by false pretenses, and conversion by a bailee. Larceny at common law required that there must be a trespass in obtaining possession of the property of another, followed by a carrying away or asportation of such property with intent to permanently deprive the owner of the value and use thereof. If possession was obtained lawfully and without fraudulent intent or if title or ownership passed, no matter how fraudulently induced, larceny was not committed. In considering §12447-1 GC, we must interpret it as extending the crime of larceny into new fields rather than attempting to restrict it, within the limits of §12447 GC, just as the statutes defining embezzlement, obtaining property by false pretense and conversion by a bailee, extended the criminal law with respect to offenses against the property of another that were not within the definition of common law larceny.

The elements of the crime as defined by §12447-1 GC are:
1. Obtaining possession or title
2. to anything of value
3. by false or fraudulent pretense, token or writing.

So far as the crime defined by this section is concerned, it matters not whether possession or title is procured. Either comes clearly within its provisions. So, in the instant case, the fact that the indictment alleges that the defendant procured possession of certain money through false representations and the evidence shows that he took money as alleged in the several indictments, under such circumstances as to clearly indicate that title thereto by the consent of the victim passed to the defendant, does not constitute a fatal variance.

The gravaman of the offense is that, unlike the crime of larceny, as defined in §12447 GC, the person from whom either possession or title is taken must consent to the transaction and such consent must be induced by "false and fraudulent" pretense, token or writing.

It must, therefore, logically follow that whether the facts or circumstances which are misrepresented or falsely pretended, then in fact exist, or are represented to then exist, or are concerned with what may be represented or promised to take place at a future time, is of no great importance. What is important is, that the representations must be falsely or fraudulently made, or the circumstances must be such that there could be no reasonable probability of their being true, and as a result of such misrepresentations or false token or pretense, one is induced to part with the possession or title to his property.

Defendant complains that the words "intent to defraud" are not contained in the statute. Such complaint must be directed to the legislature and not the courts. The legislature is vested with the power to define what conduct shall offend the criminal law of the state. And if by clear and unambiguous language of the statute, obtaining possession or title to another's property, accomplished by false or fraudulent pretense, token or writing, is made a crime punishable by fine or imprisonment, it is the duty of the court to give effect to the provisions of such statute, even though the elements of the crime as thus defined find no counterpart at common law.

No subject has been more troublesome in the law of crimes than that of larceny. The common law of larceny steadfastly excluded all conduct that did not include (1) a trespass in acquiring possession; (2) a carrying away or asportation with intent to steal the property of another, until the Carrier's case decided in 1473. In this case a bailee came into possession of the property of the prosecutor lawfully but it was held that his conduct thereafter in "breaking bulk" constituted a trespass sufficient, when followed by asportation with intent to steal, to make out the crime of larceny. The case of King v. Bazeley (1799) followed as a landmark in the history of the development of the subject. In this case the defendant was found not guilty of larceny, where he appropriated money coming into his possession as principal teller of a banking firm. The parliament, as a result of this case, passed the first general embezzlement statute to protect society against such conduct thus held not to be within the crime of larceny as then defined.

Larceny by trick was recognized as early as 1789 in the Pear's case. Pear was indicted for stealing a horse. He had hired the horse to go to Sutton and back. He sold the horse the same day. On trial the jury found by special verdict "that he had hired the horse with fraudulent intent to sell him immediately." Whereupon the court judged him guilty of felony. (See "Theft, Law & Society" by Dr. Jerome Hall.) This was a radical departure from the case law up until the trial of the Pear's case, for the reason as stated by Professor Hall, supra, beginning at page 16 and quoting from Hawkins & Lord Mansfield as follows:

" 'It seemeth to be the better opinion, that the deceitful receiving of money from one man to another's use, upon a false pretense of having a message and order to that purpose, is not punishable by a criminal prosecution, because it is accompanied with no manner of artful contrivance but wholly depends on a bare naked lie; and it is said to be

needless to provide severe laws for such mischiefs, against which common prudence and caution. may be a sufficient security.' There are many cases to support Hawkin's statement. What is particularly important, however, is that, even after the enactment of 30 Geo. II, the same rule was applied. In Rex v. Wheatley, a leading case decided in 1761, the defendant sold sixteen gallons of malt liquor, representing that there were eighteen gallons. He was not even indicted under the statute of 1757 for obtaining property by false pretenses, and the court held that he was not guilty of any offense. Lord Mansfield stated the rules as they were then interpreted:

'The offense that is indictable must be such a one as affects the public. As if a man uses false weights and measures and sells by them to all or to many of his customers, or uses them in the general course of his dealing: so, if a man defrauds another under false tokens. For these are deceptions that common care and prudence are not sufficient to guard against. So if there be a conspiracy to cheat: for ordinary care and caution is no guard against this. Those cases are much more than mere private injuries; they are public offenses. But here, it is a mere private imposition or deception; no false weights or measures are used; no false tokens given; no conspiracy; only an imposition upon the person he was dealing with, in delivering him a less quantity instead of a greater; which the other carelessly accepted. It is only a non-performance of his contract; for which non-performance he may bring his action.' "

Then followed statutes defining obtaining property by false pretense and conversion by bailees in lawful possession, which statutes were necessary because the courts were unable or unwilling to extend larceny to include such conduct.

The trend of modern statutes is to combine all of the crimes involving property (larceny, embezzlement, obtaining property by false pretense and conversion by a bailee) into one all-inclusive statute and to include conduct therein not heretofore found within any of such statutes. See New York Penal Law, Sec. 1290, 1290(a), effective Sept. 1, 1942 and Sec. 490(a) of the Penal Code of California. It must therefore be considered that such statutes are not to be interpreted by the restrictions of the past but rather in the light of their true purpose, to fill in the deficiencies found in the preceding statutory and common law rules.

An examination of §12447-1 GC, strongly indicates that

the legislature in passing said section, had before it for consideration Sections 1290 and 1290(a) of the New York Penal Code. **Sec. 12447-1 GC** follows very closely some of the wording found in the New York statute. It might have been better if the legislature had followed in principle the New York statute on larceny, as enacted in 1942, and repealed the existing law on crimes against property. Instead they enacted a new crime which they designated as "Larceny by Trick." Under §12447 GC, the phraseology of the section is such as to require judicial interpretation. It provides that "whoever steals anything of value is guilty of larceny." The courts have held that the elements of common law larceny was intended. But larceny by trick has no common law counterpart, as defined by §12447-1 GC. True, courts have used the words "larceny by trick" in decisions liberalizing the early law on the subject of what constitutes a trespass. **Eisenmann v. State, 12 Oh St 145** is a good example. But no court has ever said that where title and not possession was procured by fraud that the crime of larceny was committed.

**Kellogg v. State, 26 Oh St 15.**

In the Kellogg case, the Supreme Court held that the prosecuting witness not only was induced by fraudulent representations to give up possession of his money to the defendant, but also title. It was therefore held that the crime was not larceny, §13104 GC defining obtaining property by false pretense with intent to defraud would have been the proper statute under which the case should have been prosecuted.

Unquestionably the legislature in passing §12447-1 GC had in mind to make the distinction between procurring of possession of or title to the goods of another by means of fraud, unimportant. Often times the question of whether one has parted with title or only possession is attended with great difficulty, requiring a decision of the highest court of the state to settle the question.

**Sec. 12447-1 GC** spells out in plain and unambiguous language the elements which constitute the crime therein defined. As above set forth they are:

1. Obtaining possession or title
2. of anything of value
3. by false or fraudulent pretenses, token or writing.

One who is induced to part with the title to his property, to another by "fraudulent representations, pretense, token or writing" suffers an actionable wrong or injury to his property rights. The one engaging in such fraudulent conduct is guilty of a wrongful act. The same is equally true if, in like manner, one is induced to part with the possession of

his property. Such wrongful conduct has become the subject of a criminal statute.

I agree completely with the quotation cited by the majority of this court on the historical development of the law by Holmes (see pages 16 and 17 of the majority opinion). It shows clearly the point in issue in this case. Such wrongs as are in part defined by §12447-1 GC, and therefore included within the Criminal Code of Ohio by reason of the passage of such section, would have been, at common law, but a civil injury, for the reasons set forth in the quotation. But the legislature of Ohio is vested with the exclusive right to define what conduct shall offend the criminal law of the state, and to prescribe the elements necessary to constitute each of the crimes included within the criminal code of the state. And it requires no citation of authority to say that "intent" as a separate element need not be included as a necessary element of a particular crime, if the legislature within the reasonable exercise of its legislative authority omits such element.

The legislature in passing §12447-1 GC, spelled out each of the elements of the crime which it designated as "larceny by trick," and it is not within the power of the court to add a further element based on historical reasons.

As indicated herein, the committing of a fraudulent act which causes an injury to the property rights of another (surrendering possession or title) constitutes a wrong which is made punishable under said section. The court so charged the jury. One could not be found guilty of fraudulent conduct or deception who acts innocently and without a guilty mind. To hold that "intent to steal" (in addition to proof of fraudulent conduct) which element was not included in the statute, should have been included in the charge, seems an unnecessary duplication of legal terms.

As indicated, the court sufficiently defined the crime charged in the words of the statute, and if the defendant had desired a fuller explanation of the meaning of any of the terms used, he could have requested such additional instructions. This he did not do, and therefore cannot now claim prejudicial error on that ground. In fact the defendant does not question the correctness of the court's charge in any of his assignments of error. The question of the accuracy of the charge is therefore not before us on this appeal.

The defendant's second claim of error should, therefore, be overruled.

The defendant's third assignment of error claims misconduct of the prosecutor. The prosecutor while presenting the State's case made a request as follows:

"I would like to ask the defendant to produce Mr. Healy's business records, checks, vouchers, paid bills, the records of his business. I asked for it before and I am repeating the request. Mr. Picciano: (counsed for deft.) We say, Your Honor, this is stage play on the part of the prosecutor, because we expect to put on * * *."

At this point the jury was excused. What followed is of no importance as to this assignment of error. It should be said, however, that when the jury was recalled they were fully instructed to disregard the prosecutor's statement and request.

In 110 A. L. R., 115, in dealing with improper conduct of this kind the author says:

"The writer has found no case in which, after appropriate instructions given by the trial judge a conviction has been set aside because of an improper demand for documentary evidence."

There was no prejudice to defendant's rights on this claim of error.

Defendant's claim of error No. 4 is not supported by the record.

The 6th and 7th counts of the indictment deal with inducing Anthony Vadnal to part with $4000.00 on the promise of defendant to build a residence for him on sublot 320 in Bexley Park. The state introduced a tax foreclosure petition filed in common pleas court against this prosecuting witness within four months after defendant had deeded the lot to Vadnal as security for the return of the $4000.00 paid on the contract of purchase. The state was entitled to this evidence from the public records of this county which tended to show the falsity of defendant's representations.

Defendant's fifth claim of error has to do with the rejection of evidence tendered by him, to which objection to its introduction by the state was sustained. The evidenced offered was photostatic copies of defendant's commercial accounts with Bank of Ohio and The Cleveland Trust Co., showing deposits and withdrawals. The claimed purpose for which this evidence was offered, was to show what defendant did with the money paid to him by the several prosecuting witnesses. For such purpose the evidence offered would be of no value and would be secondary in character. It is my opinion that there is no prejudice to defendant on this claim of error.

Coming now to defendant's final claim of error, that the

verdict is manifestly against the weight of the evidence. I have already concluded in considering defendant's claim of error No. 2 that there was evidence offered on behalf of the state and received by the court supporting each of the elements of the crime of larceny by trick as defined by §12447-1 GC. It remains, therefore, only to consider whether such evidence is sufficient to justify the judgment of guilty as to each count of the indictment.

The evidence is undisputed by defendant that he received from the prosecuting witnesses (six in number and two others whose transactions with defendant were introduced in evidence under the similar offense provisions of the Code of Criminal Procedure—§13444-19 GC) the sum of $10,000.00 within a period of a little over six months from the latter part of 1946 until the middle of 1947. All of this money was paid to defendant as a part of the consideration to be paid to him by the prosecuting witnesses for the erection of dwelling houses on sublots in Bexley Park Allotment, which the defendant represented he owned. With the exception of one sewer connection, nothing was ever done by defendant toward building any of these houses. Not even a building permit was applied for. At the time these transactions were being negotiated, the evidence shows (and it was then a matter of common knowledge) that housing accommodations were almost impossible to get, whereby the prosecuting witnesses were easy victims of defendant's fraudulent representations. The defendant is alleged to have made promises of early completion dates in all of these cases as an inducement to make an immediate down payment. These deposits were all the easier procured by defendant's claims of ownership of Bexley Park Allotment then consisting of more than 200 lots. This show of financial stability at least seemed to afford some security justifying the making of such deposits by those in desperate need of housing accommodations.

The evidence tends to show that while the defendant did have title to all but one of the lots sold, the delinquent taxes destroyed any financial interest he might have had therein. His inability to continue with the construction of the houses which he then had in the process of building, which caused the bank or loan companies that had granted the construction loans thereon to take over the building operations because of defendant's financial distress, and his own admission that in early 1947 he was "financially embarrassed" is strong evidence that he never intended to do more than take the prosecuting witnesses' deposits for his own purposes and that he had no reasonable ground to believe that he would every carry out his contracts with them.

It is my opinion that the judgment of guilty on all seven counts of the indictment is supported by sufficient evidence. Therefore this claim of error should be overruled.

For the reasons stated the judgment of the common pleas court should be affirmed.